UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

C.A. No.

_____
                                        )
NIMCO REAL ESTATE ASSOCIATES, LLC,      )
ULTIMA NASHUA INDUSTRIAL CORPORATION    )
and ANOOSH IRVAN KIAMANESH,             )
                          Plaintiffs,   )
                                        )
        v.                              )
GREGORY G. NADEAU, as he is ADMINISTRATOR)
FEDERAL HIGHWAY ADMINISTRATION,         )
CITY OF NASHUA, and VARIOUS UNNAMED     )
OFFICIALS of the AFORESAID              )
AGENCIES and of the NEW HAMPSHIRE       )
DEPARTMENT OF TRANSPORTATION,           )
                          Defendants.   )
_____ )

**COMPLAINT**

**Introduction/Nature of the Case**

1.      This complaint arises from a purported eminent domain taking in 2003 on behalf of the City of Nashua, which Plaintiffs claim was or has become invalid and for which Plaintiffs have never received constitutionally and statutorily mandated just compensation, nor any relocation benefits at all due them under federal and state law.

Federal Questions

2.      Plaintiffs assert claims for declaratory, injunctive relief and/or damages relief against certain federal, state, and city agencies and officials, based on their collaboration in the gross and continuing violation of Plaintiffs' rights for just compensation and fair treatment under the Fifth and Fourteenth Amendments to the United States Constitution, The Federal Uniform

Relocation Assistance and Real Property Acquisitions Policies Act of 1970, 42 U.S.C. Chapter 61, (the "Uniform Act"), regulations thereunder at 49 CFR 24,  et seq., and assert Federal Civil Rights claims under 42 U.S.C. § 1983.

Supplemental State Law Claims

3.      Plaintiffs assert supplemental claims based on a) the Defendants' gross and continuing violation of Plaintiffs' rights under the Constitution of the State of New Hampshire, Article I, secs. 10, 12, 12a, RSA 498A and related regulations, b) municipal estoppel against the City and c) unjust enrichment against the City.

4.      Plaintiffs further seek the stay of and/or removal from state court and consolidation with this matter two related civil cases as follows: (a) an action in the form of a "Landlord and Tenant Writ" brought against Plaintiffs by Defendent City, sub nom City of Nashua v. Ultima Nashua Industrial Corporation,  9th Division District Court, Nashua, in which the court granted a Writ of Possession to the City on July 20, 2016, and (b) a civil action for money damages against Plaintiffs, brought by the City of Nashua, sub nom City of Nashua v. Ultima Nashua Industrial Corporation, Hillsborough Superior Court, Southern Judicial Division, Docket #226-2016-CV-00181.

**Jurisdiction and Venue**

This court has jurisdiction of the federal constitutional and statutory questions under 28 U.S.C. § 1331. This court has supplemental jurisdiction of the state law claims, which are "so related to claims in the action within [this court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution" under 28 U.S.C. § 1367.

**Parties**

5.     Plaintiff NIMCO REAL ESTATE ASSOCIATES, LLC. ("NIMCO"), is a New Hampshire Limited Liability Company with a usual place of business at 1 Pine Street Extension, Nashua, N.H. It was the record owner of the improved real property located at 1 Pine Street Extension, the major portion of which was purportedly taken on behalf of the City of Nashua in 2003 (the "Subject Property.")

6.     Plaintiff ULTIMA NASHUA EQUIPMENT CORPORATION ("Ultima"), is a New Hampshire Business Corporation with a usual place of business at 1 Pine Street Extension, Nashua, N.H.  It owns industrial machinery and other equipment located at all relevant times within the building at 1 Pine Street Extension, Nashua, NH.  Ultima, and its predecessor company has been in business at that location since 1958.  It is engaged in the manufacture of specialty machines, equipment, and parts for customers such as NASA, Lockheed Martin, General Electric, Raytheon, Ingersoll-Rand, The Massachusetts Institute of Technology, Lincoln Labs, and Applied Aerospace.

7.     Plaintiff ANOOSH IRVAN KIAMANESH, ("Dr. Kia,") is the Manager of NIMCO and the President and Sole Director of Ultima.  He is the majority owner of both NIMCO and Ultima.  He is a citizen of Canada.

8.     Defendant CITY OF NASHUA (the "City") is a municipality and a political subdivision of the State of New Hampshire.

9.     Defendant NEW HAMPSHIRE DEPARTMENT OF TRANSPORTATION ("NHDOT"), is an agency of the State of New Hampshire.

10.     Defendant GREGORY G. NADEAU is the current Administrator of the FEDERAL HIGHWAY ADMINISTRATION ("FHWA"), an agency of the United States Government responsible for the management and oversight of public projects related to transportation infrastructure for which federal funds are provided to state agencies and municipalities, such as NHDOT and the City.   FHWA is charged with oversight of federally-assisted highway transportation infrastructure projects and is responsible to ensure that the actions of all agencies undertaking such projects comply with the Constitution of the United States, the Uniform Act, and sections and regulations promulgated thereunder, including 49 CFR 24, et seq.

## Background

11.     On or about January 21, 2000, representatives of the City of Nashua, including its Mayor, Bernard Streeter, as well as representatives of NHDOT, conducted a meeting at the Mayor's office regarding the City's "Broad Street Parkway" project (the "Parkway Project").  Mike Rousseau, a representative of Plaintiffs, was present.   At that meeting, the City and NHDOT informed Plaintiffs that the Parkway Project would require the acquisition of the Subject Property, and the relocation of NIMCO and Ultima.

12.     In the conference report of that meeting, Nancy Mayville, P.E., NHDOT's Project Manager, wrote that the timetable estimate for the Parkway Project was as follows:

> The potential timeframe that was estimated in the discussion was:
> Jan-Sept 2000:   inventories and appraisal
> September 2000: offer and possible acquisition
> October 2000-March 2001: owner designs and gets approval for new site
> April 2001-September 2001 or December 2001 (6-9 months) new building and site is completed. Possibly move bigger machines first in the fall of 2001, then smaller in the winter and spring of 2002.
> Late spring/early summer 2002 the site could be available for demolition.
> Construction activities for this segment of the Parkway could begin in Fall 2002.

13.     At the time of the taking, and currently, Ultima owned several hundred pieces of manufacturing equipment and machinery that were located in the Subject Property.  The equipment and machinery are of great value, estimated currently to be approximately $12 million.  Many pieces of equipment are of a size and weight as to require extensive specialized installation connections, including the use of thick concrete pad foundations, and special electrical and other service connections.

14.     Plaintiffs requested that they be granted relocation assistance and benefits to effect a move as soon as possible to minimize loss of clients and market share.

15.     By letter dated March 14, 2000, Jeanne A. Grover, NHDOT's Chief Relocation Advisor informed Plaintiffs that:

> The State Department of Transportation with Federal Highway Administration's concurrence will grant you advanced relocation benefits under the following stipulation:
>
> **Nimco agrees that to receive advanced acquisition relocation assistance payments prior to the initiation of negotiations that no other tenant or occupant  will be allowed to use or otherwise occupy the areas occupied by themselves if they should vacate the premises prior to the State acquiring title to the property.**
>
> Once again, I would like to remind you that for NIMCO to receive any moving cost reimbursement, the State must be fully involved in the move. All estimates, bids, and other cost data will need prior approval from the State before any reimbursement will be considered.

[bold in original].

16.     Throughout 2000 and 2001, Plaintiffs made inquiries regarding relocation status but were told that the Parkway Project was "on hold".  No relocation assistance was provided during this time.

17.     On March 5, 2002, Eric Teitleman, City Engineer, told Plaintiffs that there was no schedule, but that the City and NHDOT had agreed to move forward.

18.     On or about March 14, 2002, Plaintiffs received a letter from Defendant NHDOT advising them of the process to apply for advanced relocation benefits.

19.     On or about March 14, 2002, John Johnson, NHDOT relocation advisor, made an initial visit to review the NIMCO/Ultima facilities at the Subject Property.

20.     At the date of Mr. Johnsons' initial review, Ultima had 50 employees and gross annual sales of approximately $3.4 Million.

21.     On or about April 2, 2003, Dr. Kiamanesh met with officials at NHDOT to review (a) the factors necessary for a move, (b) the availability of advanced relocation benefits, and (c) the initial $870,000 offer for the Subject Property.

22.     Due to the large number and heavy industrial nature of Ultima's machinery and equipment, qualifying replacement property would require specialized foundations, electric and other service connections, which were eligible for payment under the relocation law and regulations.  Plaintiffs obtained moving bids of several million dollars, and forwarded the bids to NHDOT as agent for the City.

23.     The Plaintiffs' market search revealed that the only suitable and available site for relocation, as of April, 2003, was the International Paper Box Machinery (the "IPBM Property"), located at 90 Northeastern Blvd., Nashua, then scheduled for auction on May 2, 2003.

24.     Alan Rau, Plaintiffs' relocation manager, wrote a letter on April 25, 2003 to William Janelle, Administrator of NHDOT's Right of Way Bureau, emphasizing that it was imperative that funds be available to Plaintiffs to enable relocation to the IPBM Property.

25.     Mr. Rau followed the April 25, 2003 letter with a May 15, 2003 email communication to Elizabeth Bosiak, NHDOT Right of Way Agent, asking that the relocation funding be expedited.

26.     In or about May, 2003, NHDOT offered NIMCO $1,210,000 (the "Offer") for the major portion of the Subject Property, including 2.14 acres of supporting land, leaving a .3 acre parcel of land and a portion of the building not needed for the Parkway Project, that Ultima sought to retain for a future sales office (the "Office").

27.     Upon information and belief, the Offer was based on an appraisal from Rauseo & Associates, using the "comparable sales" approach, rather than the "replacement cost" approach that would have been appropriate to a special purpose industrial building like that situated at the Subject Property.

28.     Plaintiffs were told by letter dated September 30, 2003, from Chip Johnson, NHDOT Right of Way Agent, that the difference between market data estimated value and replacement cost effectively would be considered in the determination of the relocation and reinstallation funding, as inferred from his discussion of a "turn key" move.

29.     On May 2, 2003, in reliance on NHDOT's promise that the City's Offer and relocation funds would be made available, Dr. Kia attended the auction for the IPBM Property on behalf of Plaintiffs, and was the winning bidder at $3,275,000.

30.     Plaintiffs were required to put down a deposit of $100,000 to secure its bid, which it did in reliance upon the City's promise to pay the eminent domain compensation award and relocation benefits.

31.     On May 15, 2003 and June 6, 2003, Plaintiffs informed NHDOT of its winning bid and the need to have the funds made available in time to close by a June 21, 2003 deadline.

32.     On information and belief, on or about May 20, 2003, NHDOT approved the Offer of $1,210,000.  However, no compensation payment was made to NIMCO at that time.

33.     On June 20, 2003, Plaintiffs received an "Order of Notice - Declaration of Taking" from the New Hampshire Board of Land and Tax Appeals; again, however, no compensation payment was made to NIMCO at that time.

34.     On June 21, 2003, without the funds from the taking available, Plaintiffs were forced to default on the IPBM Property purchase, thus losing their $100,000 bid deposit.

35.     A subsequent auction for the IPBM Property was scheduled for August 14, 2003.

36.     On July 7, 2003 NIMCO received a check in the amount of $1,210,138.76 from the Board of Land and Tax Appeals.

37.     On August 14, 2003, in reliance upon NHDOT's and the City's promise that relocation funds would be forthcoming, Dr. Kia participated in the second auction for the IPBM Property, and won the auction on behalf of Plaintiffs with a bid of $3,260,000.

38.     Plaintiffs were again required to put down a deposit of $100,000 to secure its bid, which it did in reliance upon the City's promise to pay the relocation benefits.

39.     On September 30, 2003, Plaintiffs received a letter from NHDOT advising that they qualified for relocation as a "displaced" business.  However, no relocation payment was made.

40.     Since no funds were made available with the September 30, 2003 letter from NHDOT, Plaintiffs' bank financing for the acquisition of the IPBM Property collapsed.

41.     On October 3, 2003, Plaintiffs again were forced to default on the purchase of the IPBM Property, and lost the second $100,000 bid deposit.

42.     Ultima's sales volume began dropping immediately after news of the taking of the Subject Property, and the need to relocate its machinery, equipment and operations.

43.     Neither NHDOT nor the City provided meaningful relocation assistance to Plaintiffs at any time.

44.     From 2004 through 2008, Plaintiffs searched on their own for an appropriate site for relocation.  At no time during this period did they receive relocation assistance or funds.

45.     From 2005 through 2010, NHDOT induced Alan Rau, Plaintiffs' relocation coordinator, to sign a series of purported leases for the Subject Property, in which the Lessor/Owner is identified as NHDOT, not the City (the "Purported Leases").

46.     The Purported Leases provide that in lieu of rent, Ultima would pay full City real estate taxes on the Subject Property, then owned by the City.  Then owned by the City, and further provides the following provision at paragraph 20 of the Purported Leases:

> The Lessee further releases the Landlord, its agents and employees, from any and all claims or demands for damages or injuries of any nature whatsoever attributable to the taking, use and occupancy of any portion of the premises caused by the construction and maintenance by the State of New Hampshire of any proposed highway and/or bridge project which abuts (or will abut) or may affect in any way the property herein leased.

47.     The Purported Leases are invalid, since the language supposedly waiving any of Ultima's rights for damages or impacts from the taking or Parkway Project was against public policy as completely without authority under, and constitutes conduct in violation of, the provisions of the Uniform Act, associated regulations and state analogues.

48.     NHDOT did not possess legal rights in the Subject Property sufficient to transfer seisen under the Purported Leases.

49.     NHDOT's failure or refusal to provide assistance required pursuant to the Federal Relocation Act compelled Mr. Rau to sign the Purported Leases in order to prevent the displacement and destruction of Ultima.

50.    NHDOT's proffer of the Purported Leases sought to temporarily address ownership issues relating to the intended removal of the Subject Property from the City's tax rolls.

51.    The purported Leases sought to recover real estate taxes assessed on real property owned by the City itself, and included the entirety of the Subject Property including the .3 acre (improved) Portion of the Subject Property that was excluded from the taking from NIMCO.

52.    NHDOT's proffer of the Purported Leases sought to compel NIMCO to allegedly agree to terms of adhesion, including a release of damages resulting from violations of law, including but not limited to the Federal Relocation Act.

53.    By 2006, with no relocation funds or assistance made available, Plaintiff Ultima was in extreme financial difficulty.  To meet its financial needs, Ultima executed a contract with Kia Technologies Corporation ("Technologies"), a Canadian Corporation based in British Columbia, under which Ultima would sell the machinery and equipment to Technologies for delivery to Technologies' directed location.

54.    Dr. Kia is a stockholder in Technologies.

55.    By 2009, with no appropriate relocation sites available at any reasonable price, and no relocation assistance or funds provided by NHDOT or the City to effectuate or fund any relocation, Dr. Kia, sought solutions both within the United States and abroad.

56.    Via and in joint venture with Technologies, Plaintiff Ultima executed contracts establishing joint ventures with three companies located in China, whereby the companies, were to create a manufacturing facility to utilize the Ultima Equipment to manufacture products designed in the US and formerly manufactured at the Subject Property (the "Move Contracts"). Under the Move Contracts, and in furtherance of this joint venture, Plaintiffs were responsible to deliver the equipment to the Chinese companies.

57.     On September 27, 2009, Mr. Sunn, a representative of the Chinese companies came to Ultima, inspected and accepted the machinery and equipment for transfer to China under the Move Contracts.

58.     On September 28 and 29, 2009, Dr. Kia met with Tom Galligani, Economic Development Director of the City, and John Vancor, Project Manager of the Parkway Project, who was employed by the City's consultant, Hayner-Swanson, Inc.

59.     At these meetings, Dr. Kia informed Mr. Galligani of the visit of the Chinese representative and the need for funds to ship the equipment to China pursuant to the Move Contracts.

60.     As of the meeting on September 29, 2009, Dr. Kia was told that the Parkway Project would impact the Subject Property and building.

61.     No relocation funds were subsequently made available.

62.     On December 18, 2009, Alan Rau on behalf of Plaintiffs sent NHDOT Right of Way Agent Supervisor John "Chip" Johnson a letter specifically requesting relocation assistance and benefits.

63.     On January 5, 2010, Alan Rau telephoned Chip Johnson at NHDOT to request an update on the December 18, 2009 letter requesting relocation.  Mr. Johnson told Mr. Rau that he had forwarded the letter, but for the first time told Mr. Rau that the City was revising the plan and might not need the building on the Subject Property, but perhaps only some easements.

64.     On April 26, 2010, Plaintiffs received a letter from the Director of Public Works for the City, stating that the Subject Property was no longer required for the Parkway Project and that Plaintiffs would not be required to move from the Subject Property.  The Director did not address the requested relocation funds.

65.     On August 2, 2010, Plaintiffs received an email communication from Mr. Johnson, informing them that the Subject Property was no longer required for the Parkway Project and that relocation funds were no longer available.

66.     During the period between the taking in 2003 and the August 2, 2010 NHDOT email communication, Ultima's sales volume plummeted, as evidenced by a decrease in revenues from approximately $3.4 million to $0.6 million, due to Plaintiffs' inability to secure manufacturing contracts when under the threat of having to move at an unspecified date.

67.     Plaintiffs received no formal explanation from either NHDOT or the City explaining why relocation funds would not be paid or were no longer available.  When Mr. Rau requested a legal reason, Mr. Johnson of NHDOT merely sent Plaintiffs a copy of 49 C.F.R. Part 24.  Other than providing a copy of 49 C.F.R. Part 24, NHDOT failed to provide any explanation of Plaintiffs' rights under federal and state law and regulations in such circumstances.

68.     Four years later, on September 12, 2014, Plaintiffs received a letter from Thomas Galligani on behalf of the City, offering for the first time to allow NIMCO to purchase the Subject Property from the City for the amount of $1,210,000.

69.     On September 26, 2014 Dr. Kia responded by email to Thomas Galligani's letter, that he was unable to purchase the Subject Property, due to the fact that the 2003 taking award was used to keep the Ultima from failing due to the failure or refusal to provide meaningful relocation assistance and benefits.

70.     On April 1, 2015, Thomas Galligani, on behalf of the City, sent Plaintiffs a letter advising that the City was preparing to market the Subject Property and that it would require that Ultima enter into another lease agreement[1].

71.     On June 25, 2015, the City sent a draft lease to Plaintiffs, requiring that Plaintiffs pay $8,800 per month in rent, a sum that Plaintiffs were unable to pay, following the virtual destruction of Ultima and its business by the actions of Defendants.

72.     On July 14, 2015, Dr. Kia sent a letter to Mr. Johnson and to the City stressing the critical importance and need of the relocation assistance funds to allow Plaintiffs to meet their obligations under the Move Contracts that were necessitated directly by the failure of the City and NHDOT to give meaningful relocation assistance, and make required relocation funds available.

73.     On information and belief, during the summer of 2015, the City commenced efforts to market the Subject Property to others for potential uses unrelated to any valid public purpose.

74.     On August 6, 2015, the City sent an eviction notice to Plaintiffs, and a Notice to Quit by or before November 6, 2015.

75.     Plaintiffs did not quit the Subject Property, since it had no location to move to, and no possible means of moving the extensive machinery and equipment at the Subject Property without the required relocation assistance.

76.     In May, 2016, the City filed the Hillsborough Superior Court action against Plaintiff Ultima, seeking damages from Ultima in the amount of the real estate taxes through 2015, under

---

[1] The City is requesting damages in its Superior Court Complaint referenced in paragraph 3 that assume the Purported Leases had continued up until this period.  The very fact that Thomas Galligani, on behalf of the City, demanded a new lease with the City, indicates that the last Purported Lease referenced in paragraph 45 was not in effect.

13

the last Purported Lease referenced in paragraph 45 above.  On or about April 18, 2016, the City

sent Plaintiffs a notice to vacate by July 15, 2016.

       77.     The City then brought a "Landlord and Tenant Writ" against Plaintiffs, sub nom

<u>City of Nashua v. Ultima Nashua Industrial Corporation</u>, 9th Division District Court, Nashua.

       78.     On July 20, 2016 the court granted a Writ of Possession to the City.

### **Claims for Relief**

### **COUNT I**
(Declaratory and Injunctive v. FHWA and/or its Officials for failing or neglecting to
undertake its responsibilities under the Uniform Act and regulations thereunder)

       79.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 78

above as if fully set forth in this count.

       80.     42 U.S.C. Chapter 16 sets forth the Uniform Act.

       81.     The preamble to "Uniform policy on real property acquisition practices", which

applies to all Federally-funded projects, sets forth the overarching purposes for the Uniform Act.

Among the pertinent purposes stated are, "to assure consistent treatment for owners in the many

Federal programs, and to promote public confidence in Federal land acquisition practices[.]" and

"to encourage and expedite the acquisition of real property by agreements with owners, to avoid

litigation and relieve congestion in the courts, to assure consistent treatment for owners in the

many Federal programs, and to promote public confidence in Federal land acquisition practices[.]"

42 U.S.C. § 4651.

       82.     Pursuant to 42 U.S.C. § 4655, the head of the federal agency involved, in this case

the FHWA is barred from allowing federal funding to be used on any project unless he/she is given

assurances that the state agency will comply to the greatest extent practicable under state law with

the uniform land acquisition policies set forth in § 4651 and other sections, and that property

owners will be paid or reimbursed for necessary expenses as specified in §§ 4653 and 4654.

83.     The State of New Hampshire has adopted the Uniform Act, for all acquisitions,

including all projects with <u>no federal participation</u>, so all of the provisions and policies of the

Uniform Act are entirely consistent with state law.  See RSA 124A.

84.     42 U.S.C. § 4621 sets forth the uniform policy for relocation assistance.   Its

overarching purposes are to:

> establish [] a uniform policy for the fair and equitable treatment of persons displaced
> as a direct result of programs or projects undertaken by a Federal agency or with
> Federal financial assistance. The primary purpose of this subchapter is to ensure that
> such persons shall not suffer disproportionate injuries as a result of programs and
> projects designed for the benefit of the public as a whole and to minimize the hardship
> of displacement on such persons.

85.     Pursuant to the Uniform Act, and regulations thereunder, the FHWA Defendants

have a duty to ensure that public projects for which federal funds are expended meet the essential

purposes of the cited laws and regulations to treat persons and companies whose property is taken

fairly and consistent with their constitutional rights. <u>See also</u> CFR 49 Part 24.

86.     Despite this duty, the federal defendants under this claim utterly failed or neglected

to insure proper management of the acquisition and relocation process and failed to require that

such process expeditiously provide required relocation funds to Plaintiffs, in violation of the

policies of the above referenced sections and their obligations under federal law.

87.     By failing or neglecting to properly oversee and require NHDOT and the City to

comply with regulations and give proper relocation assistance and benefits in their exercise of their

project, FHWA has violated federal law and its own regulations, and allowed NHDOT and the

City to violate Plaintiffs' rights under the cited statutes, regulations, and the Constitution of the United States.

88.     By failing or neglecting to require that NHDOT and the City give Plaintiffs proper relocation and other benefits and comply with the requirements under the cited statutes, regulations, and the constitution, while at the same time NHDOT and the City treated other similarly situated landowners whose land was taken for the project more favorably, FHWA allowed NHDOT and the City to treat Plaintiffs in a disparate manner from the treatment of other landowners whose property was taken or injured for the public project. While Plaintiffs were provided no relocation assistance or benefits, NHDOT and/or the City provided such benefits for at least four other landowners/tenants.

89.     On information and belief, FHWA directly insisted that funds not be released to provide relocation of Plaintiffs.  That is a patent violation of its duty under the Uniform Act and regulations thereunder.

90.     Wherefore, Plaintiffs request that this honorable court order that FHWA require that NHDOT and the City cease all efforts to evict, displace or claim money damages from the Plaintiffs, under the Purported Lease or otherwise, and provide Plaintiff proper relocation benefits post haste, and such other relief as this court determines is mete and just.

### COUNT II

(Declaratory, Injunctive, damages, Federal & State Regulatory claim for Relocation
v. City of Nashua, and equitable relief only (not money damages) against NHDOT and its
officials as they are and have acted as Agents for the City)

91.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 90 above as if fully set forth in this count.

92.     Plaintiffs are a "displaced person" under the definition of the same contained in 49 C.F.R. Part 24.

93.     RSA 124A:1 of the State of New Hampshire establishes:

[…] a uniform policy for the fair and equitable treatment of persons displaced as a direct result of programs or projects undertaken by a state agency in order that such persons shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on such persons.

94.     The State of New Hampshire has broadly adopted the Uniform Act as amended, for all acquisitions, including projects with federal **or** state funds, RSA 124A:13.

95.     According to the NHDOT The Right of Way Manual:

All municipally managed projects must acquire ROW for federally funded projects in accordance with this FHWA approved ROW Manual and that the Bureau Administrator or ROW Engineer must sign off on their ROW certificates (NHDOT is responsible for the actions/inactions of municipalities for any Title 23 [Federal Highway] funds administered through the NHDOT).

96.     NHDOT and or NHDOT Officials acted by their own assertion at all times relevant hereto as the agent(s) for the City.

97.     As such, and by requirements under the Uniform Act and regulations thereunder, as Agents for the City, NHDOT and its officials had an affirmative duty to ensure that Plaintiffs were treated fairly, that all federal and state laws and regulations were followed, and that Plaintiffs be provided proper relocation assistance.  As Agents for the City, NHDOT and or NHDOT Officials utterly failed or refused to fairly treat Plaintiffs in the acquisition process, and to ensure that the City gave them the required relocation assistance and benefits.

98.     By failing to ensure that Plaintiffs received their proper relocation assistance and benefits, NHDOT and its officials, acting as Agents for the City, violated their obligations to Plaintiffs under NH Constitution Part 1, Article 1, which requires that the state and its

municipalities have a constitutional obligation "to provide assistance to all their citizens."  Kelsey v. Town of Hanover, 157 N.H. 632, 638 (2008), See also Carbonneau v. Town of Rye, 120 N.H. 96, 99, 411 A.2d 1110 (1980); Richmond Co. v. City of Concord, 149 N.H. 312, 314, 821 A.2d 1059 (2003); Savage v. Town of Rye, 120 N.H. 409, 411, 415 A.2d 873 (1980).

99.     Wherefore, Plaintiffs request that this honorable court order that the NHDOT cease all efforts to assist the City to evict or displace or claim money damages from the Plaintiffs, under the Purported Lease or otherwise, require the City to pay money damages to Plaintiffs for the relocation benefits and assistance that Plaintiffs should have received, and such other relief as this court determines is mete and just.

## COUNT III
(Violation of 5th Amendment of the United States Constitution for New Taking v. City)

100.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 99 above as if fully set forth in this count.

101.     By effectively "freezing" the Plaintiff's equipment and business in place for many years since the purported taking of the improved Subject Property, through failing or neglecting to provide relocation assistance or pay Plaintiffs' the required relocation benefits, without which it could not move, thereby stressing and damaging the company, the City and NHDOT as its Agent have made a temporary unlawful taking of the equipment and business.  The temporary unlawful taking has persisted from the City and NHDOT's first failure to pay the required relocation benefits in 2003 continuing up through the present, and has continued uncompensated in violation of the Fifth Amendment to the U.S. Constitution, Part 1, Articles 12 and 12-a of the New Hampshire Constitution, and federal and state law.  See Kimball Laundry Co. v. United States, 338 U.S. 1

(1949)]; First English Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304 (1987).

102.    By filing an eviction action against Plaintiffs, following their failure or refusal to provide required relocation assistance and benefits, the City and NHDOT are collaborating in making an unlawful and permanent taking of Plaintiffs' business and millions of dollars-worth of extremely valuable machinery and equipment.

103.    Wherefore, Plaintiffs request this honorable court declare that the City by and through NHDOT has taken Plaintiffs' businesses and equipment, and set the case down for trial by jury for damages for the unlawful takings against the City by the Agency of NHDOT, and such other relief as this court determines is mete and just.

### COUNT IV
(Constitutional Claim for Damages from Original Taking; to reopen based
on mutual mistake of fact in Waiver of additional compensation v. City)

104.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 103 above as if fully set forth in this count.

105.    Plaintiffs accepted the payment of the eminent domain damages in 2003 under the mistaken beliefs induced by the representations of NHDOT as Agent for the City,  and the City, that Plaintiffs would be paid relocation damages.

106.    At the time of the eminent domain damages payment, NHDOT and the City represented that relocation benefits would be paid.

107.    No such relocation benefits were ever paid to Plaintiffs.

108.    The acceptance of the eminent domain award without contesting it in a Superior Court case and jury trial, was therefore, at best, the result of a mutual mistake of fact.

109.    Wherefore any waiver of a challenge to the original award must be overturned as an invalid contract of release procured by means of mutual mistake of fact.

110.    Wherefore, Plaintiffs request that this honorable court declare that any waiver that might be construed due to Plaintiffs' failure to claim additional eminent domain damages at the time was void as based on mutual mistake of fact, and set this count for jury trial to set damages for the original eminent domain taking in 2003, together with interest and for such other relief as is mete and just.

### COUNT V
(Violation of Equal Protection under the 14th Amendment by the City)

111.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 110 above as if more fully set forth herein.

112.    Pursuant to the Fourteenth Amendment to the U.S. Constitution, Plaintiffs were entitled to equal protection in the application to them of the Constitution and laws of the United States and the State of New Hampshire.

113.    The Plaintiffs were denied relocation assistance and benefits while four other similarly-situated businesses whose land had been taken were given relocation assistance and benefits.  As a result, Plaintiffs have not been equally treated under law.  As such, at a minimum, Plaintiffs form a class of companies owned all or in substantial part by Dr. Kia, that were treated unequally under the Fourteenth Amendment. See Village of Willowbrook v. Olech, 528 U.S. 562 (2000).

114.    Despite providing Plaintiffs no relocation assistance or benefits, the City provided relocation assistance and paid to relocate four other businesses.

20

115.    Defendants led Plaintiffs to believe, for over ten years, that the Subject Property in which their business was located was destined to be destroyed, and that they would receive the funds they needed, and were entitled to, to move to another suitable site.

116.    Throughout this time, Defendants were aware that their failure to provide Dr. Kia with the necessary relocation assistance and funds was having a devastating and deleterious effect on his business, as his ability to secure manufacturing contracts was severely impaired by potential customers' knowledge of the building's impending destruction.

117.    No other business similarly situated to Plaintiffs was deprived of relocation funds it was lawfully entitled to, and thus unable to vacate property taken for the Parkway Project.

118.    No other business similarly situated to Plaintiffs was subsequently sued by the City for eviction and damages.

119.    Plaintiffs were never offered a valid reason by the Defendants as to why they were treated differently from other businesses similarly situated.

120.    Defendants' intentional failure to provide Plaintiffs relocation funds, while at the same time providing such funds to other businesses, whose property was taken for the Parkway Project, and then suing Plaintiffs for eviction and damages, was arbitrary, and had no rational and valid public purpose or authority

121.    By inference from the gross and excessive delays Defendants engineered, together with the refusal to provide relocation assistance and benefits despite Dr. Kia's repeated entreaties, Defendants' disparate treatment of the Plaintiffs was done with an improper intent and based on impermissible considerations or ill will toward Plaintiffs.

122.    Defendants' conduct constitutes a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

123.    Wherefore, Plaintiffs request that this honorable court order that the City cease all efforts to evict, displace or claim money damages from the Plaintiffs, under the Purported Lease or otherwise, and award damages in an amount to be determined at trial for all consequential damages suffered by the Plaintiffs as the result of Defendants' deprivation of their rights under the Fourteenth Amendment to the United States Constitution, including but not limited to proper relocation benefits, lost profits and business opportunities, impairment of reputation, and out-of-pocket losses, as well as their reasonable attorneys' fees and costs, and such other relief as this court deems mete and just.

### COUNT VI
(Civil Rights Count under 42 U.S.C. §1983,
officials of the City of Nashua)

124.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 123 above as if more fully set forth in this count.

125.    Under the Uniform Act and the regulations promulgated thereunder, Defendants have a duty to ensure that persons and companies whose property is taken for public projects are treated fairly, equitably and consistent with their constitutional rights. Further, under the Uniform Act and the regulations promulgated thereunder, Defendants have a duty to ensure that displaced persons "will not suffer disproportionate injuries" as the result of public projects.

126.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of property with due process of law, nor shall such property be taken for public use without just compensation.

127.    Pursuant to the Fourteenth Amendment to the U.S. Constitution, Plaintiffs were entitled to equal protection in the application to them of the constitution and laws of the United States and the State of New Hampshire. Because, as set forth below, the Plaintiffs were denied

relocation whole four other similarly situated businesses whose land had been taken were given theirs, Plaintiffs have not been equally treated.  As such, at a minimum, Plaintiffs form a class of two who were treated unequally under the Fourteenth Amendment.  See Village of Willowbrook v. Olech, 528 U.S. 562 (2000).

128.    Beginning in 2000 and continuing through to the present day, Defendants, acting under color of both state and federal law, have engaged in a series of actions that have deprived Plaintiffs of their rights to be treated fairly, equitably and consistent with their rights secured by both state and federal law.

129.    Additionally, Defendants have deprived Plaintiffs of their constitutional right restricting the taking of their property only for a valid public purpose.

130.    Specifically, and as set forth above, the City and the NHDOT as its Agent repeatedly promised Plaintiffs that they would receive relocation funds in connection with the taking of the Subject Property.

131.    Dr. Kia advised the City on several occasions that it was imperative that he receive the relocation funds in a timely manner, so that he could move his substantial manufacturing equipment and machinery as expeditiously as possible in order to minimize the disruption to his business.

132.    Dr. Kia advised the Defendants that due to the large number and heavy nature of Ultima's machinery, any new property would need require specialized foundations, electric and other service connections.

133.    In reliance on the City and the NHDOT's promises that Plaintiffs would receive relocation funds, Dr. Kia twice bid to purchase a building suitable for the relocation of his business.

On both occasions, Dr. Kia lost $100,000 deposit because the Defendants did not provide him the promised funds necessary to move the business.

134.    Ultima's sales continued to plummet as the news of the taking, and the obvious disruption it would create in Plaintiffs' manufacturing operations, reached Ultima's customers.

135.    Even after Plaintiffs received payment for the Subject Property, and purportedly no longer owned the facility at the Subject Property, Defendants still failed to provide Plaintiffs with the means necessary to relocate their business.

136.    Under the impending threat of being forced to move as soon as the Parkway Project commenced, and in effort to keep his business alive, Dr. Kia continued to search for an appropriate location into which he could move his manufacturing operations, relying on the Defendants' continued promises that Plaintiffs would receive the relocation funds to which they were entitled.

137.    Finally, in 2008, in order to keep the business alive, Plaintiffs entered into the Move Contracts.

138.    Dr. Kia requested the promised relocation funds from the City to enable Plaintiffs to fulfill contractual relocation obligations under the Move Contracts.

139.    No relocation funds were provided to Plaintiffs.  In fact, more than ten years after being told by the City and NHDOT that the Subject Property would be taken, and that they would receive the monies necessary to relocate the business, Dr. Kia received a letter from the City informing him that the Subject Property was no longer required for the Parkway Project.  Dr. Kia was also informed by NHDOT that because the Subject Property was no longer needed, that Plaintiffs no longer qualified for relocation assistance and benefits as "displaced persons."

140.    Defendants continued their unfair and inequitable course of conduct by then requiring Plaintiffs to execute a Purported Lease to remain on the Subject Property.

141.    When Plaintiffs were unable to pay the demanded rent, the City commenced both eviction proceedings and a civil action in Superior Court seeking damages against Plaintiffs, even from portions of the Subject Property which had never been taken from Plaintiffs.

142.    As the direct result of Defendants' dilatory, inequitable and grossly unfair course of conduct in direct violation of Plaintiffs' rights under the United States Constitution and federal laws, that spanned over fifteen years and left Plaintiffs in a wholly untenable position, Plaintiffs suffered severe losses.

143.    Defendants' course of action has also violated Plaintiffs' constitutional rights limiting the taking of their property for a valid public purpose.

144.    The taking of Plaintiffs' property by the City constitutes an unlawful taking in violation of the Fifth Amendment to the Constitution of the United States and Article 12a of the New Hampshire Constitution, because the Property was never used for the public use for which it was purportedly taken.  Instead, Defendant City intends to divert it to private development use, which can never be a public use in N.H. for taken property. R.S.A. 498-A:2, the N.H. Eminent Domain Procedures statute, states:

> public use shall not include the public benefits resulting from private economic development and private commercial enterprise, including increased tax revenues and increased employment opportunities.

145.    Wherefore, Plaintiffs request that this honorable court order that the City cease all efforts to evict, displace or claim money damages from the Plaintiffs, under the Purported Lease or otherwise, and award damages in an amount to be determined at trial for all consequential damages suffered by Plaintiffs as the result of Defendant's deprivation of their rights secured by the Constitution and laws, including but not limited to proper relocation benefits, lost profits and

business opportunities, mental anguish, impairment of reputation, and out-of-pocket losses, and such other relief as this court deems mete and just.

## COUNT VII
### (42 U.S.C. § 4654; Attorneys' fees and litigation expenses
### because project was abandoned or held invalid)

146.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 145 above as if fully set forth in this count.

147.  42 U.S.C. § 4654 provides that:

"The Federal court having jurisdiction of a proceeding instituted by a Federal agency to acquire real property by condemnation shall award the owner of any right, or title to, or interest in, such real property such sum as will in the opinion of the court reimburse such owner for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of the condemnation proceedings, if--
(1) the final judgment is that the Federal agency cannot acquire the real property by condemnation [i.e., the taking is invalid]; or
(2) the proceeding is abandoned by the United States.

148.    42 U.S.C. § 4654 is applicable to Federally-funded projects such as the Parkway Project.

149.    The City and NHDOT as its Agent have alleged that they abandoned the portion of the public project for which they require Plaintiffs' Subject Property.

150.    Because the Subject Property has never been applied to public use for which it was purportedly taken, and the use to which the City intends to put it - private development- cannot be a public use under New Hampshire law, the taking is invalid.

151.    Even if valid when made, the public purpose for which the Subject Property was purportedly taken has been abandoned by the City and NHDOT.

152.    Plaintiffs have suffered great and significant consequential damages and litigation expenses due to the City's invalid or abandoned taking.

153.     Wherefore Plaintiffs ask that this honorable court grant them litigation costs, attorneys and expert fees under 42 U.S.C. § 4654 against the City of Nashua, and such other relief as this court deems mete and just.

## COUNT VIII
(Municipal Estoppel v. City)

154.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 153 above as if fully set forth in this count.

155.     On numerous dates, including but not limited to those referenced in the preceding paragraphs, various officials of the City and NHDOT acting as Agent for the City told Plaintiffs that they were entitled to relocation assistance and benefits, and that such benefits would be forthcoming.

156.     The officials who made these promises to Plaintiffs were authorized to convey such information to Plaintiffs.

157.     The officials who made these promises to Plaintiffs knew or should have known that Plaintiffs would rely on these statements.

158.     The statements made by the aforesaid authorized officials withheld important information from Plaintiffs, including information as to their rights under federal and state law, and information as to the City's intention not to give relocation assistance or benefits in a timely matter, pending a multi-year process to determine whether or not their highway project would need the Subject Property.

159.     The statements made by those authorized officials have proven to be false.

160.    Plaintiffs had no knowledge of the truth concerning their rights under federal and state law, nor the City's intention to withhold relocation assistance and benefits for years, while it determined if the Subject Property was actually needed for the Parkway Project.

161.    Plaintiffs reasonably relied on the above-referenced statements by the authorized officials, and changed their position to their substantial financial detriment.

162.    Damages which the Plaintiffs suffered in reliance on the above-referenced statements included but are not limited to the following:

    a.      Loss of Plaintiff's deposit of $100,000 caused by defaulting on the purchase of the IPBM Property, as described in paragraphs 26, 27, and 31 above;

    b.       Loss of Plaintiff's deposit of $100,000 caused by defaulting on its second attempted purchase of the IPBM Property, as described in paragraphs 33, 34 and 37 above;

    c.      Loss of numerous contracts with customers due to Plaintiffs being unable to commit to contracts while waiting for relocation benefits in reliance of the aforesaid authorized officials' statements;

    d.      Payments of interest made in order to achieve financing for Plaintiff's businesses continuing operation, which financing was arranged to bridge the gap until the payment of relocation benefits, in reliance on the aforesaid authorized officials' statements;

    e.      Consequential damages from Plaintiff's inability to comply with the terms of its executed contracts to sell the equipment and deliver it in China, which contracts it entered into in reliance on the aforesaid authorized officials' statements;

163.    Wherefore Plaintiffs request this honorable court to declare that the City is estopped to deny the existence of the promises of their aforesaid authorized officials; to declare that that Plaintiffs reasonably relied on the same to their detriment; to enjoin the City to grant Plaintiff its relocation benefits, and to award additional money damages for all injury occasioned by Plaintiffs' reliance on the aforesaid authorized officials' statements; including all consequential damages therefrom, See Turco v. Town of Barnstead, 136 N.H. 256 (1992), and for and such other relief as this court deems mete and just.

### IX. UNJUST ENRICHMENT
(City of Nashua)

164.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 163 above as if fully set forth in this count.

165.    As noted in paragraph 61 and 62, the City brought and the court granted a Writ of possession against Plaintiffs.

166.    Plaintiffs have no means to pay the millions of dollars necessary to relocate their equipment, much of which are extremely large machines fixed to the building and supported by large concrete pads.

167.    By taking possession and evicting Plaintiffs from the Subject Property, the City will gain possession of all the Plaintiffs equipment.

168.    The equipment has a worth of millions of dollars.

169.    If the City is allowed to go forward and evict plaintiffs, without providing for relocation assistance and benefits, the City will be unjustly enriched to the value of the Plaintiffs' equipment.

170.    Wherefore, Plaintiffs request this honorable court to enjoin the City from evicting Plaintiffs, and/or pay money damages to Plaintiffs for the unjust enrichment, or grant such other relief as the court deems mete and just.

171.    Wherefore in sum on ALL COUNTS, Plaintiffs seek an award of damages from the non-state actors in the amount of $25,000,000 or such greater amount as will make Plaintiffs whole, together with interest in accord with law, their reasonable attorneys' fees and costs, and such other relief as this court deems mete and just.

Respectfully submitted,

Plaintiffs
By their Attorneys,


Dated:  September 9, 2016          /s/ William E. Aivalikles_____
                                  William E. Aivalikles, Bar No. 308
                                   60 Main Street, Suite 230
                                   Nashua, NH 0306
                                  (603) 880-0303
                                  william@nhtriallaw.com

                                  /s/ Mark S. Bourbeau_____
                                  Mark S. Bourbeau, MA BBO #050715
                                  Of Counsel
                                  Drohan Tocchio & Morgan, PC
                                  175 Derby Street, Suite 30
                                  Hingham, MA 02043
                                  (781) 749-7200
                                  mbourbeau@dtm-law.com